**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**Case No.**

MELVIN B. LONG,

        **Plaintiff,**

vs.

DANIEL JOSEPH TOUIZER,
aka JOSEPH TOUIZER,
STEPHANE TOUIZER,
aka STEPHAN TOUIZER,
SAUL DANIEL SUSTER,
JOHN KEVIN REECH,
PROTECTIM INSURANCE SERVICES LLC.,
PROTECTIM HOLDINGS LLC, and
WHEAT CAPITAL MANAGEMENT LLC.

        **Defendant(s).**
_____/

# COMPLAINT

Plaintiff, **MELVIN B. LONG**, sues Defendants, **DANIEL JOSEPH TOUIZER aka JOSEPH TOUIZER, and STEPHANE TOUIZER**, aka STEPHAN TOUIZER, and **SAUL DANIEL SUSTER, and JOHN KEVIN REECH,** and **PROTECTIM INSURANCE SERVICES, LLC, and PROTECTIM HOLDINGS, LLC**, and **WHEAT CAPITAL MANAGEMENT, LLC**, and alleges the following:

# Introduction

Defendants **DANIEL JOSEPH TOUIZER, and STEPHANE TOUIZER, and SAUL DANIEL SUSTER, and JOHN KEVIN REECH,** individually and working in concert with each other**,** committed fraud and embezzlement, and breached their fiduciary duties, as agents of Defendants

**PROTECTIM INSURANCE SERVICES, LLC, and PROTECTIM HOLDINGS, LLC**, and **WHEAT CAPITAL MANAGEMENT, LLC.**

### Jurisdiction and Venue and Parties

1.  This is an action for damages exceeding $75,000.00, exclusive of attorney's fees, pre-judgment interest, and costs.

2.  PLAINTIFF **MELVIN B. LONG** ("PLAINTIFF") at all times material hereto is and was a resident of Virginia, is and was retired, and is and was over 65 years of age.

3.  At all times material hereto, PLAINTIFF was a purchaser of purported securities offered and sold by DEFENDANTS.

4.  Defendant, **DANIEL JOSEPH TOUIZER aka JOSEPH TOUIZER**, is an adult resident of Miami-Dade County ("D.J. TOUIZER"). Upon information and belief, TOUIZER is an alien, being a citizen of Canada.

5.  D.J. TOUIZER was also the manager member of PROTECTIM INSURANCE SERVICES, LLC, and PROTECTIM HOLDINGS, LLC, and WHEAT CAPITAL MANAGEMENT, LLC, at various times. D.J. TOUIZER has claimed on company websites to be "a seasoned entrepreneur with over twenty years of experience in creating several multi- million-dollar start-up companies within the insurance, travel, computer, and alternative investment industries" and also claimed to have "led a multitude of highly successful campaigns across the capital formation and marking processes."

6.  Defendant, **STEPHANE TOUIZER**, aka STEPHAN TOUIZER, is an adult part-time resident of Broward County, Florida ("S. TOUIZER"), and is sued individually, and in his capacity as the current managing member and agent of PROTECTIM INSURANCE

SERVICES, LLC, and PROTECTIM HOLDINGS, LLC. S. TOUIZER is a natural person over the age of 18 years, and upon information and belief, S. TOUIZER is an alien, being a citizen of Canada, and is the owner and CEO of EQUITYFEED, which is a company that runs a trading platform that was "designed and built to give retail day traders the trading advantage."

7.     Defendant, **WHEAT CAPITAL MANAGEMENT, LLC** ("WHEAT"), purported to be a fully integrated private equity real estate firm based in Fort Lauderdale, Florida, that was founded by D.J. TOUIZER. It was a limited liability Delaware corporation doing business in the State of Florida, and formed in March 2015.  In addition, D.J. TOUIZER operated Wheat Storage Partners I, L.P., Wheat Storage Partners II, L.P., and Wheat Storage Partners III, L.P., and was the controlling shareholder of all of these entities.  WHEAT was administratively dissolved by the State of Florida in September 2018.

8.     Defendant **SAUL DANIEL SUSTER** ("SUSTER") is an adult resident of Florida, and acted to solicit potential investors for PROTECTIM INSURANCE and WHEAT, and is sued individually.

9.     Defendant **JOHN KEVIN REECH** ("REECH") is an adult resident of Florida, and acted to solicit potential investors for PROTECTIM INSURANCE and WHEAT, and is sued individually.

10.     Defendant, **PROTECTIM INSURANCE SERVICES, LLC** ("PROTECTIM INSURANCE") is a Florida limited liability company, formed in February 2017. It is the entity that holds PLAINTIFF'S investment funds, and it is an alter ego of D.J.

TOUIZER.  PROTECTIM INSURANCE was administratively dissolved by the State of Florida in September 2018.

11.     Defendant, **PROTECTIM HOLDINGS, LLC** ("PROTECTIM HOLDINGS") is a Florida limited liability company, formed in February 2017.  It is the entity that also holds PLAINTIFF'S investment funds vis-a-vis the Trust Account of Ira Marcus, P.A., and it is an alter ego of D.J. TOUIZER.   PROTECTIM HOLDINGS was administratively dissolved by the State of Florida in September 2018.

12.     The share interest in PROTECTIM INSURANCE purchased by PLAINTIFF was purported to be a security within the meaning of Florida Statute § 517.021, Securities Exchange Act of 1934 § 3, and the Virginia  Securities Act § 13.1.

13.     The subscription agreement issued by PROTECTIM INSURANCE was purported to be a security within the meaning of Florida Statute § 517.021, Securities Exchange Act of 1934 § 3, and the Virginia  Securities Act § 13.1.

14.     This Court has diversity jurisdiction pursuant to 28 U.S.C. § 1332 because all parties are diverse in citizenship or residency, has supplemental jurisdiction over pendant state claims, and also has federal question jurisdiction pursuant to Section 27 of the Securities Exchange Act of 1934 and 28 U.S.C. § 1331.

15.     Venue is appropriate in this district because the underlying fraud and theft of PLAINTIFF'S funds took place within this district, and/or because all DEFENDANTS reside within this district.  Furthermore, the Subscription Agreements for WHEAT and PROTECTIM INSURANCE require that any action and/or proceeding is "solely [in] the exclusive jurisdiction and venue of the federal and/or state courts located in Broward County, Florida."

16.    The Subscription Agreements state that service of process in "any such action and/or proceeding may be made by first class mail, certified or registered, to the parties respective addresses."

17.    The prevailing party "shall be entitled to recover his/her/its reasonable attorneys' fees and costs from the other party."

## **FACTS**

18.    DEFENDANTS unjustly enriched themselves by misappropriating investor money for their personal use and benefit by making material misrepresentations that were false and fraudulent when made, and concealing and failing to state material facts concerning, among other things, the safety and profitability of investing in PROTECTIM INSURANCE and WHEAT, through the purchase of purported stock in these companies, and the DEFENDANTS' excessive commission and fees.

19.    D.J. TOUIZER brought about the creation of PROTECTIM INSURANCE, PROTECTIM HOLDINGS, and WHEAT, and other business entities, to be used as vehicles to commit fraud and theft of funds from unsuspecting victims, such as PLAINTIFF.  D.J. TOUIZER and others participated in this scheme to defraud that raised millions of dollars from the sale of purported stock and other interests in his investment companies.

20.    D.J. TOUIZER opened various bank accounts to be used as vehicles to aid in the commission of the fraud and theft  from unsuspecting victims, such as PLAINTIFF.

21.    D.J. TOUIZER directed investors such as PLAINTIFF to make payments for the investment companies's stock transactions by: (a) transferring funds electronically via

interstate wires to bank accounts that D.J. TOUIZER controlled; or (b) by mailing checks to the investment companies' offices in Broward County, Florida.

22.    Once one investment company failed, D.J. TOUIZER often funded the start up of the next investment company with money raised from previous investors.  D.J. TOUIZER would use money received from investors for, among other things, undisclosed sales commissions, fees, and other monetary distributions to himself, to his sales agents, and to other people he hired.

23.    As alleged more fully herein, D.J. TOUIZER and others admitted guilt to organizing and leading a criminal conspiracy wherein he made materially false and fraudulent statements to investors regarding the use of their investor funds, between 2010 and 2017, enabling him to steal, misappropriate and embezzle millions of dollars.

24.    PROTECTIM INSURANCE and PROTECTIM HOLDINGS were formed as Florida limited liability corporations in February 2017.  Howard Yagerman ("YAGERMAN") was named the managing member of both of them, and a Wells Fargo Bank Account was opened in the name of PROTECTIM INSURANCE, naming Yagerman as the "entity owner."

25.    Because these PROTECTIM entities had a "managing member," Section 605.0407, Fla. Stat., classified the entities as member-managed.

26.    D.J. TOUIZER also listed himself as the "managing member" of WHEAT.

27.    On or about August 8, 2017, PLAINTIFF was solicited over the telephone by D.J. TOUIZER to make an investment in a unit of WHEAT.  D.J. TOUIZER knew that PLAINTIFF had been previously involved in the storage facility business in Virginia, that he was elderly, and that he had money to invest.  On that same date, D.J.

TOUIZER sent PLAINTIFF an email that stated: "you can potentially earn over 200% annually in the firm of profit sharing . . . you can start to potentially earn 15% or more annually starting in a few months from our fee revenues to the firm."  It was signed "Joseph D. Touizer."

28. Based on that conversation, D.J. TOUIZER caused a package to be mailed to PLAINTIFF containing a business plan for WHEAT.  In that plan, PLAINTIFF was solicited to purchase a purported one share unit of WHEAT, directly from D.J. TOUIZER for $300,000.

29. Thereafter PLAINTIFF mailed a check for $30,000, on or about August 10, 2017.

30. D.J. TOUIZER asked PLAINTIFF to wire the additional $270,000, and in return for sending money via wire transfer (as opposed to a check), D.J. TOUIZER offered PLAINTIFF a purported additional 1/3 share unit of WHEAT.  D.J. TOUIZER also offered PLAINTIFF a purported additional ½ share unit if he would serve on the WHEAT Advisory Board, but PLAINTIFF did not accept that offer.

31. PLAINTIFF wired to WHEAT the sum of $270,000 on or about August 21, 2017, for a total investment of $300,000, which has never been repaid.  PLAINTIFF signed two purported "Subscription Documents" outlining his investment in each entity.  *See Exhibits 1 and 2*.  Those agreements referenced a Confidential Private Placement Offering dated June 7, 2017, which stated in part:

¶15.  The Managing Member and members of the Company's management will not be subject to liability except in certain instances and will, in certain circumstances be entitled to indemnification. Under the Operating Agreement, the Managing Member/CEO, certain other persons acting on his behalf and members of the Company's management will generally not be liable to the Company or the Members for any act or for failure to act, ***unless any such act or failure was in bad faith, the result of active and deliberate dishonesty,***

*gross negligence or resulted in a financial profit or other advantage to which such person or entity was not legally entitled.*

(Emphasis added).

32.  Unbeknownst to PLAINTIFF, D.J. TOUIZER, acting as the alter ego of all of his related entities, commingled funds between PROTECTIM INSURANCE and WHEAT, under the guise of, and fraudulently characterized as, loans from PROTECTIM INSURANCE to WHEAT, entities wholly unrelated to each other, except for the common fraudulent scheme perpetuated by D.J. TOUIZER.

33.  On August 15, 2017, FBI agents executed a search warrant signed by U.S. Magistrate Valle, of the Southern District of Florida, and searched WHEAT'S offices on the sixth floor of the One Financial Plaza tower in Fort Lauderdale, which is also where PROTECTIM INSURANCE was beginning its operations. According to an inventory affidavit, law enforcement agents hauled away documents outlining the company's confidential business plan, marketing brochures and telephone sales scripts used by salespeople "to follow up on leads and close investors."

34.  Law enforcement agents also discovered a "Phone-pro's Creed" displayed at various work stations. In part, it read, "My phone and I are universal soldiers. We are the masters of our check writers. We are the saviors of my life." "So be it, until there is no stone left unturned and the check clears," it concluded.

35.  Unbeknownst to PLAINTIFF, on August 17, 2017, YAGERMAN reviewed PROTECTIM INSURANCE Wells Fargo bank records from a bank account set up by YAGERMAN and D.J. TOUIZER, and determined that D.J. TOUIZER had embezzled over $1.5 millions of investor funds, by transferring the funds to himself, to other

entities such as WHEAT, and to his brother S. TOUIZER's entities, from May 2017 through August 2017.  D.J. TOUIZER was notified that YAGERMAN suspected fraud.

36.     YAGERMAN also contacted the FBI agents who had searched WHEAT'S offices, and advised them of the embezzled funds from PROTECTIM INSURANCE investors.  In addition, on the morning of August 21, 2017, D.J. TOUIZER removed an additional $660,000 from the Wells Fargo bank account, at the same time that YAGERMAN attempted to place those funds in a trust account.  YAGERMAN provided all bank records to the FBI during a meeting on August 31, 2017.  Shortly thereafter, a federal arrest warrant was issued for D.J. TOUIZER for fraud.

37.     Nonetheless, after the FBI raid but before his arrest, D.J. TOUIZER contacted PLAINTIFF on or about September 15, 2017, and told him that there was a PROTECTIM Confidential Private Placement Offering ("Protectim Offering"), and that the goal was to raise $2.4 million to be "used for sales and marketing, working capital and general corporate purposes."  In addition, these investor funds were to be used exclusively for "the implementation of [the] business plan, specifically, marketing, offering and providing various insurance products and services to consumers in the U.S.."  *See Exhibits 1 and 2.*

38.     Juanita Salazar, from PROTECTIM INSURANCE, sent PLAINTIFF via email a pre-addressed federal express envelope so that he could send in an investment check.

39.     The Offering listed the Managing Member as "Joseph Touizer."  It also listed YAGERMAN as "Co-Director of Sales and Marketing."  *See Exhibit 1.*

40.   The PROTECTIM Confidential Executive Summary indicated that PROTECTIM was to "establish itself as on the nation's leading providers of consumer direct insurance products, offering individuals and families fixed indemnity health insurance, term life insurance and supplemental health products that are affordable."

41.   The Executive Summary listed "Joseph D. Touizer" as the CEO, President, Secretary, and Treasurer, Jennifer Newman as the COO, and Howard Markowitz as the CFO.

42.   PLAINTIFF, still unaware of the FBI execution of the search warrant and the impending arrest of D.J. TOUIZER, invested in PROTECTIM, at the request of D.J. TOUIZER, on September 15, 2017, by sending a check in the amount of $150,000, to D.J. TOUIZER.

43.   On August 21, 2017, D.J. TOUIZER set up two newly established TD Bank Accounts in the name of PROTECTIM HOLDINGS (ending in 5022) and PROTECTIM INSURANCE (ending in 5014) ("TD Bank Accounts").  These accounts were controlled by D.J. TOUIZER, and were set up to transfer funds from the PROTECTIM INSURANCE Wells Fargo bank account, once D.J. TOUIZER learned that YAGERMAN had detected his fraudulent transfers.  YAGERMAN attempted to place all investor funds into a trust account, but was unsuccessful.

44.   PLAINTIFF'S check in the amount of $150,000 was deposited by D.J. TOUIZER into these TD Bank accounts.  At one point, these accounts had $938,932 in them.  PLAINTIFF invested a total of $150,000 in PROTECTIM INSURANCE and has not been paid back.

45.   It was later determined that in mid-summer 2018, TD Bank closed these PROTECTIM accounts.  At that time, attorney Ira Marcus, Esq., at the direction of D.J. TOUIZER,

and based on a wire transfer initiated by S. TOUIZER, allowed a transfer of over $862,000 to his own IOLTA trust account, from the TD Bank accounts. All of these funds emanated from PROTECTIM investors.

46.  DEFENDANTS REECH, SUSTER, and D.J. TOUIZER each solicited investors purportedly for WHEAT entities and PROTECTIM INSURANCE. As for PROTECTIM INSURANCE, these DEFENDANTS were able to secure a total of $1.7 million in proceeds from 14 investors. *See Exhibit 2*. Most of the PROTECTIM investors were also WHEAT investors, like PLAINTIFF.

47.  According to various purported subscription agreements with each PROTECTIM INSURANCE investor, some investors were given a purported 1/4 share for $75,000 while others were give a purported ½ share for the same investment of $75,000.

48.  No PROTECTIM INSURANCE investor has received a dividend, or been repaid their investment, despite demands, except for one investor.

49.  A subsequent rough accounting indicated that **$1,588,865** had been fraudulently transferred out of the PROTECTIM INSURANCE Wells Fargo operating account, and that over **$325,500** had been transferred to D.J. TOUIZER as purported "fees" paid to him.

50.  In addition, the rough accounting of PROTECTIM INSURANCE investor funds shows that **$612,400** had been listed as "loans" paid to WHEAT CAPITAL and EQUITYFEED. It was later admitted by DEFENDANTS D.J. TOUIZER, REECH, and SUSTER, in their "Factual Proffers" offered in their criminal cases, that they used PROTECTIM INSURANCE and WHEAT as part of a widescale fraud on unsuspecting investors.

51.    According to the federal Criminal Complaint filed on September 19, 2017, supporting

the arrest of D.J. TOUIZER, the FBI alleged:

According to investors JK and KM, Touizer represented that the initial investment
capital raise for Protectim was specifically going to be used to fund the call center and
for marketing and advertising related to the business.  However, pursuant to the FBI's
forensic analysis of bank records, approximately 90% of the $1,799,960 raised from
investors, from June 2017 to August 2017, were personally misappropriated by Touizer
and his co-conspirators.

In addition to the foregoing, the Protectim bank records show significant transactions
that occurred after the FBI executed the three premises Search and Seizure Warrants
mentioned above.  On or about August 21, 2017, Touizer withdrew from the Protectim
bank account $60,000 via a personal check.  That same day Touizer caused the
withdrawal of $600,000 . . . in the form of a cashier's check."

52.    D.J. TOUIZER was later indicted by a federal grand jury on or about November 21,

2017, along with DEFENDANTS SUSTER and REECH.  They were all indicated for

conspiracy to commit mail and wire fraud, in violation of 18 USC § 1349, along with

substantive counts.  D.J. TOUIZER was also indicted on money laundering charges.

Case No. 17-CR-60286-BB (Southern District of Florida).

53.    D.J. TOUIZER'S fraudulent activities caused PROTECTIM INSURANCE to cease

operations, thereby requiring the lease to lapse on the PROTECTIM INSURANCE

office, and depleting any capital for operations.

54.    On or about March 19, 2018, Defendant SUSTER admitted to participating in a

scheme to defraud, that included D.J. TOUIZER'S companies, including

PROTECTIM, and that this conspiracy involved $15 million raised by D.J. TOUIZER

from the sale of stock and other interests.  In particular, he admitted that he was paid

by D.J. TOUIZER to fraudulently pose as a successful investor, and that D.J.

TOUIZER'S companies made him a significant profit.  He entered a guilty plea affirming to these facts and was sentenced to 30 months imprisonment thereafter.

55.     On or about March 27, 2018, Defendant REECH admitted to participating in a scheme to defraud, that included D.J. TOUIZER'S companies, including PROTECTIM, and that this conspiracy involved $15 million raised by D.J. TOUIZER from the sale of stock and other interests.  He entered a guilty plea affirming to these facts and was sentenced to 20 months imprisonment thereafter.  He was subsequently ordered to pay restitution in the amount of $966,000.00.

56.     On or about May 11, 2018, D.J. TOUIZER admitted to organizing and leading a criminal conspiracy to defraud investors, that included D.J. TOUIZER'S companies, including WHEAT, PROTECTIM INSURANCE, Wheat Self-Storage Partners I, II, and III, and that this conspiracy involved $15 million raised by D.J. TOUIZER from the sale of purported stock and other interests, from which he diverted funds to himself.

57.     D.J. TOUIZER entered a guilty plea affirming that he in fact made materially false and fraudulent statements to investors, and was sentenced to 68 months imprisonment thereafter.  D.J. TOUIZER also used the alias name "JOSEPH TOUIZER" as part of the criminal conspiracy.

58.     On October 10, 2018, after an evidentiary hearing that determined that PROTECTIM INSURANCE investors were also victims of the fraudulent scheme, D.J. TOUIZER was further ordered to pay restitution to various individuals, including $1,697,500.00 to 14 PROTECTIM INSURANCE investors.

59.     On or about October 12, 2018, the SEC filed an Administrative Proceeding (No. 3-

18867) against D.J. TOUIZER, to suspend or bar him from selling penny stocks, and

alleging:

1.      From approximately 2010 to 2017, Touizer engaged in the business of effecting
transactions in securities for the account of others by working as an unregistered
broker and hiring unregistered brokers to participate in offerings of stock in a
number or private companies he controlled, including Omni Guard, Infinity
Diamonds, Infinity Direct Insurance (d/b/a Corvina Holdings), Wheat Capital
Management, and Wheat Self-Storage Partners I, II, and III, which are penny stocks.

2.      On May 11, 2018, Touizer pled guilty to one count of conspiracy to commit
wire and mail fraud in violation of Title 18, United States Code, Section 1349
before the United States District Court for the Southern District of Florida, in
United States v. Daniel Joseph Touizer et al., Case No. 17-60286-CR-Bloom. On
July 24, 2018, a judgment in the criminal case was entered against Touizer, and
Touizer was sentenced to 68 months in prison.

3.      The counts of the criminal information to which Touizer pleaded guilty
alleged, among other things, that Touizer defrauded investors and obtained money
and property by means of materially false and misleading statements in connection
with stock sales. In connection with that plea, Touizer admitted that:
(a) From approximately 2010 to 2017, he solicited investments in a number of
private companies he controlled, including Omni Guard, Infinity Diamonds,
Infinity Direct Insurance (d/b/a Corvina Holdings), Wheat Capital
Management, and Wheat Self-Storage Partners I, II, and III.
(b) He also hired, oversaw, and controlled individuals who solicited investors in
"phone rooms," sometimes using fictitious names, in an effort to sell them stock
in the companies Touzier controlled.
(c) Touizer acted as the "closer" on nearly all of the stock sales.
(d) To create the illusion that some of the companies were profitable, Touizer also
paid a co-conspirator to pose as an investor and falsely tell investors that his
investment in Touizer's companies made him a significant profit.
(e) Investors were told these companies were profitable, which was false.
(f) Investors were told that these investments were safe, which was false.
(g) Investors were told that their funds would be used for working capital and to
pay for sales and marketing expenses. In fact, the funds were used in part to
start new ventures and to pay new investors' "dividends."
(h) Investors were also told that no commissions or fees would be charged. In fact,
Touizer and his co-conspirators used investor funds to pay themselves
undisclosed commissions and fees.

60.     Defendant S. TOUIZER, the brother of D.J. TOUIZER, has refused to release details of the whereabouts of any of the remaining funds belonging to PROTECTIM investors. In various business filings, he is listed by the first names "Stephane" and "Stephan."

61.     Defendant S. TOUIZER filed with the State of Florida, Department of Corporations, documentation indicating that he is was the new Registered Agent and Managing Member of the PROTECTIM entities, and he requested on July 2, 2018, that YAGERMAN be removed as the Managing Member of PROTECTIM HOLDINGS AND PROTECTIM INSURANCE.

62.     In an effort to lull PLAINTIFF into ceasing his requests for repayment of his investor funds, S. TOUIZER contacted PLAINTIFF via email on or about July 12, 2018, and provided him  a forensic report from Fiske & Co., which purported to show that no fraud occurred with the WHEAT entities.  PLAINTIFF nevertheless demanded his investments back from S. TOUIZER, his agents and attorneys.

63.     The WHEAT entities have several parcels of real estate, and upon conviction in the federal criminal case, the district court ordered that numerous properties be subject to forfeiture.  The other WHEAT entities' properties are controlled by at least a dozen other entities, which further serve as the alter egos of D.J. TOUIZER.

64.     The PROTECTIM and WHEAT entities were administratively dissolved by the State of Florida on or about September 28, 2018, and have not been reinstated.

65.     As part and parcel of the fraud, DEFENDANTS D.J. TOUIZER, REECH, and SUSTER made false statements to investors, including PLAINTIFF, that no commission or fees would be charged to investors, that the investment companies (WHEAT and PROTECTIM INSURANCE) were a "safe environment," that the

investment companies were successful and profitable, that D.J. TOUIZER did not personally take a salary or draw on funds, that investor funds would be used for sales and marketing, working capital and general corporate purposes.

66.     Instead, a review of the PROTECTIM INSURANCE investment funds revealed that the majority of funds were used by D.J. TOUIZER for his personal benefit, and that funds were placed into his personal bank accounts.

67.     All of the Subscription Agreements for WHEAT and PROTECTIM INSURANCE are void *ab initio* due to D.J. TOUIZER'S fraudulent acts, as more fully alleged herein.

68.     D.J. TOUIZER personally profited from the $450,000 in investments made by PLAINTIFF, because D.J. TOUIZER took improper fees from the WHEAT and PROTECTIM entity accounts, and transferred funds from those accounts for his personal use, between August and September 2017, when PLAINTIFF made his investments.

69.     D.J. TOUIZER made materially false and fraudulent statements to PLAINTIFF to induce him to make the various investments, including a promise to make PLAINTIFF an advisor for WHEAT.  D.J. TOUIZER also attempted to solicit additional investments from TOUIZER right before his arrest in September 2017.

70.     The following fraudulent activity took place once PROTECTIM INSURANCE was organized in March  2017, up through August 2017:

| | | |
|---|---|---|
| 8/21/17: | Money order/funds placed in TD Bank Account: | **$600,000.00** |
| 7/27/17: | Check fbo *Howard Markowitz* (Sears): | **$1,696.00** |
| 7/12/17: | Check fbo *Howard Markowitz* (Sears): | **$4,447.50** |
| 8/1/17: | Check fbo *Howard Markowitz* (Sears): | **$3,392.00** |
| 8/4/17: | Check fbo *Howard Markowitz* (Sears): | **$265.49** |
| 7/31/17: | Check to *Saul Suster*: | **$6,500.00** |
| 6/20/17: | Wire to EquityFeed Corp. (FBO S.TOUIZER): | **$50,000.00** |
| 8/21/17: | Check to D. Touizer (fee) | **$60,000.00** |
| Wires/Checks listed as Loans to WHEAT CAPITAL: | | **$612,400.00** |
| Wires/Checks listed as"Fees" to D.J. TOUIZER: | | **$325,500.00** |

71. The only legitimate business expenses paid from the PROTECTIM INSURANCE Wells Fargo bank account was approximately $13,000 for advertising, $12,227 for office furniture, $21,814 used for rent, $775 for registration fees, $4,000 for a security system, and about $10,000 for salaries.

72. To further create the illusion that PROTECTIM INSURANCE continues to operate, and to avoid repaying PROTECTIM INSURANCE investors, D.J. TOUIZER hired attorneys to represent that S. TOUIZER would take over PROTECTIM INSURANCE, that there existed insurance licenses, and that no fraud occurred with investments made for PROTECTIM INSURANCE.

73. To further create the illusion that WHEAT and its entities were not sham companies, D.J. TOUIZER hired attorneys and an accounting firm, Fiske & Company, to create a sham forensic examination of WHEAT.  S. TOUIZER contacted PLAINTIFF on July 12, 2018, via email, to advise him of the forensic report, in order to lull him into believing that WHEAT had not been engaged in fraud, and that he should not demand his WHEAT investment back. S.TOUIZER signed his email as the CEO of EQUITYFEED.

74.  To further hide PROTECTIM INSURANCE investor funds,  D.J. TOUIZER hired attorney Ira Marcus, Esq., to represent that PROTECTIM INSURANCE was not part of  D.J. TOUIZER'S scheme to defraud investors.

75.  In opposition to a federal restitution order to be entered for the benefit of PROTECTIM INSURANCE victims, D.J. TOUIZER called his attorney, Ira Marcus, Esq., to testify at a restitution hearing on October 10, 2018, that PROTECTIM INSURANCE was going to reorganize, knowing that such reorganization is both impractical and impossible, given the fraudulent acts of D.J. TOUIZER and his agents.

76.  To benefit himself and S. TOUIZER, D.J. TOUIZER further organized an exit scheme, whereby he would be able to use PROTECTIM INSURANCE investor funds for his own benefit, even when convicted of the fraud alleged herein.

77.  At present, Ira Marcus, Esq., holds in his trust account approximately $862,000, which his own testimony of October 10, 2018, is directly traceable to PROTECTIM INSURANCE investor funds.  D.J. TOUIZER, Ira Marcus, and S. TOUIZER, working in concert with each other, have refused to return PROTECTIM INSURANCE investor funds, despite demands being made.

## COUNT I

### (Fraud as to all Defendants)

78.  PLAINTIFF realleges and adopts by reference the allegations contained in paragraphs 1 through 77, as if fully set forth herein.

79.  D.J. TOUIZER defrauded investors and obtained money and property by organizing a scheme to defraud by means of materially false and misleading statements in

connection with purported stock sales for both PROTECTIM INSURANCE and WHEAT.

80.     D.J. TOUIZER and SUSTER and REECH, in connection with a guilty plea, admitted that: (a) From approximately 2010 to 2017, they solicited investments in a number of private companies that D.J. TOUIZER controlled, including Omni Guard, Infinity Diamonds, Infinity Direct Insurance (d/b/a Corvina Holdings), WHEAT, Wheat Self-Storage Partners I, II, and III, and PROTECTIM INSURANCE.

81.     D.J. TOUIZER also hired, oversaw, and controlled individuals who solicited investors in "phone rooms," sometimes using fictitious names, in an effort to sell them stock in the companies Touzier controlled.

83.     D.J. TOUIZER acted as the "closer" on nearly all of the stock sales.

84.     To create the illusion that some of the companies were profitable, D.J. TOUIZER also paid a co-conspirator to pose as an investor and falsely tell investors that his investment in D.J. TOUIZER'S companies made him a significant profit.

85.     Investors were told these companies were profitable, which was false.

86.     Investors were told that these investments were safe, which was false.

87.     Investors were told that their funds would be used for working capital and to pay for sales and marketing expenses. In fact, the funds were used in part to start new ventures and to pay off previous investor victims' "dividends" so that the fraud would continue.

88.     Investors were also told that no commissions or fees would be charged. However, D.J. TOUIZER and REECH and SUSTER and S. TOUIZER used investor funds to pay themselves undisclosed commissions, loans, and fees.

89.     In making his investments into PROTECTIM INSURANCE and WHEAT, PLAINTIFF reasonably relied upon the material misrepresentations and omissions of D.J. TOUIZER.

90.     All DEFENDANTS took part in the fraudulent activities, as more fully set forth herein.

91.     As a result of this fraudulent conduct, PLAINTIFF suffered compensatory damages, as more fully alleged herein.  Furthermore, PLAINTIFF had to hire counsel, and incur additional costs to prosecute this action against DEFENDANTS.

**WHEREFORE**, PLAINTIFF demands a jury trial on all issues so triable, and demand a judgment against DEFENDANTS, for compensatory damages, attorneys fees, costs of this action, and any other relief that this Court deems just.

## COUNT II

### (Breach of Fiduciary Duty by Defendant D.J. TOUIZER, PROTECTIM INSURANCE, and WHEAT as to PROTECTIM INSURANCE and WHEAT investments)

92.     PLAINTIFF realleges and adopts by reference the allegations contained in paragraphs 1 through 77, as if fully set forth herein.

93.     Defendant D.J. TOUIZER,  owed a fiduciary duty to PLAINTIFF, by virtue of his position as Managing Member of PROTECTIM INSURANCE and WHEAT.

94.     Defendant D.J. TOUIZER  breached his fiduciary duty, as more specifically alleged herein, and in particular, by siphoning funds from PROTECTIM INSURANCE and WHEAT to personally benefit himself and others who participated in the fraudulent activities.

95.     The breach of this duty was the proximate cause of PLAINTIFF'S damages, which exceed $150,000 as to PROTECTIM INSURANCE and $300,000 as to WHEAT.

96.     Damages flow from the breach, in that Defendant D.J. TOUIZER'S acts, error and omissions, caused the collapse of PROTECTIM INSURANCE and WHEAT, and the inability to repay investors and fulfill its promises to PLAINTIFF.

97.     As a result of Defendant D.J. TOUIZER 'S multiple breaches of his fiduciary duties, PLAINTIFF suffered damages including lost investment funds owed to him. Furthermore, PLAINTIFF had to hire counsel, and incur additional costs to prosecute this action against DEFENDANTS.

**WHEREFORE**, PLAINTIFF demands a jury trial on all issues so triable, and demands a judgment against D.J. TOUIZER, for compensatory damages, attorneys fees, costs of this action, and any other relief that this Court deems just.

## COUNT III
### (Breach of Contract by Defendant D.J. TOUIZER,
### PROTECTIM INSURANCE, and WHEAT
### as to PROTECTIM INSURANCE and WHEAT investments)

98.    PLAINTIFF realleges and adopts by reference the allegations contained in paragraphs 1 through 77, as if fully set forth herein.

99.    D.J. TOUIZER and PROTECTIM and WHEAT entered into respective Subscription Agreements with PLAINTIFF, attached as *Exhibits 1 and 2*.

100.   By reason of the conduct alleged herein, these DEFENDANTS breached the contract by embezzling, misappropriating and/or misusing PLAINTIFF's investor funds.

101.   As a result of DEFENDANT'S breaches of these contracts,  PLAINTIFF suffered damages including lost investments owed to him, and future proceeds that had been promised.  Furthermore, PLAINTIFF had to hire counsel, and incur additional costs to prosecute this action against DEFENDANTS.

**WHEREFORE**, PLAINTIFF demands a jury trial on all issues so triable, and demands a judgment against DEFENDANTS D.J. TOUIZER, PROTECTIM INSURANCE, and WHEAT, for compensatory damages, attorneys fees, costs of this action, and any other relief that this Court deems just.

## COUNT IV
### (Unjust Enrichment as to DEFENDANTS
### D.J. TOUIZER, S. TOUIZER, PROTECTIM INSURANCE, and WHEAT)

102.   PLAINTIFF realleges and adopts by reference the allegations contained in paragraphs 1 through 77, as if fully set forth herein.

103.     PLAINTIFF provided DEFENDANTS D.J. TOUIZER and PROTECTIM INSURANCE and WHEAT with approximately $450,000.00, for investment.

104.     These funds were stolen, misused and/or not used for their intended purpose, as more fully alleged herein.

105.     DEFENDANTS D.J. TOUIZER, S.TOUIZER, PROTECTIM INSURANCE and WHEAT have not repaid PLAINTIFF for this debt, despite demands for the same.

106.     The outstanding balance of this debt due to PLAINTIFF, by DEFENDANTS, exclusive of interest, is $450,000.

107.     DEFENDANTS D.J. TOUIZER, S.TOUIZER, PROTECTIM INSURANCE and WHEAT have all been unjustly enriched by their failure to repay PLAINTIFF on this debt.

108.     As a result of this unjust enrichment,  PLAINTIFF suffered damages including lost investments owed to him, in the amount of $450,000, plus interest and consequential damages.  PLAINTIFF had to hire counsel, and incur additional costs to prosecute this action against these DEFENDANTS.

**WHEREFORE**, PLAINTIFF demands a jury trial on all issues so triable, and demands a judgment against DEFENDANTS D.J. TOUIZER, S. TOUIZER, PROTECTIM INSURANCE, and WHEAT, for compensatory damages, attorneys fees, costs of this action, and any other relief that this Court deems just.

## COUNT V

### (Violation of the Virginia Securities Act § 13.1
### as to DEFENDANT D.J. TOUIZER)

109.   PLAINTIFF realleges and adopts by reference the allegations contained in paragraphs

1 through 77, as if fully set forth herein.

110.   PLAINTIFF provided DEFENDANTS D.J. TOUIZER and PROTECTIM

INSURANCE and WHEAT with approximately $450,000.00, for investment, as

more fully alleged herein.

111.   D.J. TOUIZER defrauded investors and obtained money and property by organizing

a scheme to defraud by means of materially false and misleading statements in

connection with purported stock sales for both PROTECTIM INSURANCE and

WHEAT.

112.   PLAINTIFF is a resident of Virginia, and was solicited by phone, while in Virginia,

to make the investments alleged herein.

113.   § 13.1-502, of the Virginia Securities Act, states:

Unlawful offers and sales.
It shall be unlawful for any person in the offer or sale of any securities, directly or
indirectly,
(1) To employ any device, scheme or artifice to defraud, or
(2) To obtain money or property by means of any untrue statement of a material fact
or any omission to state a material fact necessary in order to make the statements
made, in the light of the circumstances under which they were made, not misleading,
or
(3) To engage in any transaction, practice or course of business which operates or
would operate as a fraud or deceit upon the purchaser.

114.    The purported stock offered by D.J. TOUIZER for both WHEAT and PROTECTIM INSURANCE are securities within the meaning of the Virginia Securities Act.

115.    DEFENDANT D.J. TOUIZER, in connection with the sale of securities, either directly or indirectly, violated § 13.1-502, of the Virginia Securities Act.

116.    As a result of DEFENDANT D.J. TOUIZER'S fraudulent conduct that violated the Virginia Securities Act,  PLAINTIFF suffered damages including lost investment funds owed to him, and future proceeds that had been promised.  Furthermore, PLAINTIFF had to hire counsel, and incur additional costs to prosecute this action against DEFENDANT D.J. TOUIZER.

**WHEREFORE**, PLAINTIFF demands a jury trial on all issues so triable, and demands a judgment against DEFENDANT D.J. TOUIZER for compensatory damages, attorneys fees, costs of this action, and any other relief that this Court deems just.

## COUNT VI

**(Violation of the Florida Securities Act, Florida Statute § 517.301
as to DEFENDANT D.J. TOUIZER )**

117.    PLAINTIFF realleges and adopts by reference the allegations contained in paragraphs 1 through 77, as if fully set forth herein.

118.    PLAINTIFF provided DEFENDANTS D.J. TOUIZER and PROTECTIM INSURANCE and WHEAT with approximately $450,000.00, as investment funds, as more fully alleged herein.

119.    D.J. TOUIZER defrauded investors and obtained money and property by organizing a scheme to defraud by means of materially false and misleading statements in

connection with purported stock sales for both PROTECTIM INSURANCE and WHEAT, of which PLAINTIFF was one such investor.

120.   D.J. TOUIZER operated PROTECTIM INSURANCE and WHEAT in Florida, and solicited investor funds from his place of business, in Broward County, Florida, as more fully alleged herein.

121.   The Florida Securities Act, Section 517.301, Fla. Stat., provides in part:

517.301 Fraudulent transactions; falsification or concealment of facts:

(1) It is unlawful and a violation of the provisions of this chapter for a person:
(a) In connection with the rendering of any investment advice or in connection with the offer, sale, or purchase of any investment or security, including any security exempted under the provisions of s. 517.051 and including any security sold in a transaction exempted under the provisions of s. 517.061, directly or indirectly:
1. To employ any device, scheme, or artifice to defraud;
2. To obtain money or property by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; or
3. To engage in any transaction, practice, or course of business which operates or would operate as a fraud or deceit upon a person.

122.   The purported stock offered by D.J. TOUIZER for both WHEAT and PROTECTIM INSURANCE are securities within the meaning of the Florida Securities Act.

123.   DEFENDANT D.J. TOUIZER, in connection with the rendering of any investment advice or in connection with the offer, sale, or purchase of any investment or security, directly and indirectly, and negligently, violated Section 517.301, *et seq*., Fla. Stat.

124.   As a result of DEFENDANT D.J. TOUIZER'S fraudulent conduct that violated the Florida Securities Act,   PLAINTIFF suffered damages including lost investments owed to him, and future proceeds that had been promised.  Furthermore, PLAINTIFF

had to hire counsel, and incur additional costs to prosecute this action against DEFENDANTS.

**WHEREFORE**, PLAINTIFF demands a jury trial on all issues so triable, and demands a judgment against DEFENDANT D.J. TOUIZER for compensatory damages, attorneys fees, costs of this action, and any other relief that this Court deems just.

Respectfully submitted,
*Valentin Rodriguez*

_____
VALENTIN RODRIGUEZ, ESQ.
Valentin Rodriguez, P.A.
2465 Mercer Avenue, Suite 301
West Palm Beach, FL 33401
(561) 832-7510
Fla Bar No.  047661
defend@bellsouth.net

 -and-

Robert S. Franklin, Esq.
ROBERT S. FRANKLIN, P.A.
2465 Mercer Avenue, Suite 301
West Palm Beach, FL 33401
(561) 775-7000
Fla. Bar No.: 914061
rfranklinlaw@gmail.com

Counsel for PLAINTIFF